# UNITED STATES DISTRICT COURT

# FOR THE WESTERN DISTRICT OF WISCONSIN

---

**WAYNE J. MALONE, JR.,**

      **Plaintiff,**

**v.**                                             **Case No.  19-cv-891-wmc**

**HOOGLAND FOODS, LLC dba
MARCO'S PIZZA,**

      **Defendant.**

---

## PLAINTIFF'S RESPONSE BRIEF IN OPPOSITION TO DEFENDANT'S MOTION TO COMPEL ARBITRATION OF PLAINTIFF'S CLAIMS

---

Malone opposes Defendant's Motion to Compel Arbitration because he did not assent to Hoogland's Arbitration Agreement. Malone also opposes Hoogland's request to dismiss this case because he has concerns regarding the statute of limitations due to Hoogland's failure to timely disclose its Arbitration Agreement. Malone asks the Court to deny Hoogland's motion, schedule a jury trial on the issue of whether an arbitration agreement was formed, and permit the parties to conduct discovery on that issue.

**The Court should proceed to a trial on whether the parties agreed to arbitrate because Malone has raised a material factual issue regarding the formation of an arbitration agreement.**

    **A.  A motion to compel arbitration is treated as a motion for summary judgment.**

A court reviews a motion to compel arbitration similarly to a motion for summary judgment: It takes the non-moving party's evidence as true and draws all

reasonable inferences in the light most favorable to the non-moving party. *Moorman v. Charter Communs., Inc.*, No. 18-cv-820-wmc, 2019 U.S. Dist. LEXIS 74642, at *2 n.3 (W.D. Wis. May 1, 2019) (citations omitted).

Whether a valid arbitration agreement exists is a matter for the Court rather than an arbitrator to decide. *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 530 (2019). If this Court determines that Malone has produced sufficient evidence to raise a factual issue concerning whether he and Hoogland Foods, LLC dba Marco's Pizza ("Hoogland") ever formed an arbitration agreement, then "the court shall proceed summarily to the trial thereof." *Abdul Mohammed v. Uber Techs., Inc.*, 237 F. Supp. 3d 719, 728-729 (N.D. Ill. 2017); *Tinder v. Pinkerton Sec.*, 305 F.3d 728, 735 (7th Cir. 2002). The Federal Arbitration Act provides that, where the facts are disputed as to whether an arbitration agreement was made, the party alleged to be in default may demand a jury trial. 9 U.S.C. § 4; *Scheurer v. Fromm Family Foods LLC*, 863 F.3d 748, 751 (7th Cir. 2017). In addition, the Court may allow limited discovery regarding the issue of contract formation. *Deputy v. Lehman Bros., Inc.*, 345 F.3d 494, 514 (7th Cir. 2003).

**B.  Under Wisconsin contract law there was no offer or acceptance of the Arbitration Agreement.**

Whether parties agreed to arbitrate is a matter of state contract law. *Ineman v. Kohl's Corp.*, No. 14-cv-398-wmc, 2015 U.S. Dist. LEXIS 38296, at *10 (W.D. Wis. Mar. 26, 2015). Arbitration is a matter of consent. *Lamps Plus, Inc. v. Varela*, 139 S. Ct. 1407, 1415 (2019). A court cannot compel a party to arbitrate a dispute unless that party has contractually agreed to do so. *Karl Schmidt Unisia, Inc. v. Int'l Union, United Auto., Aero.,*

*& Agric. Implement Workers of Am., UAW Local 2357*, 628 F.3d 909, 912 (7th Cir. 2010),

citing *AT&T Techs., Inc. v. Commc'ns Workers of Am* ., 475 U.S. 643, 648-49 (1986).

Under Wisconsin law, the elements of a contract are offer, acceptance, and

consideration. *Carroll v. Stryker Corp.*, 670 F. Supp. 2d 891 (W.D. Wis. 2009), *aff'd*, 658

F.3d 675 (7th Cir. 2011). "An offer is a communication by a party of what it will give or

do in return for some act by another. . . . Acceptance of an offer requires 'a meeting of

the minds, a factual condition that can be demonstrated by word or deed.' . . . Like an

offer, an acceptance can be communicated in writing, orally or implied from the parties

conduct." *Carroll,* 670 F. Supp. 2d. at 898 (citations omitted). Whether a party has made

or accepted an offer is a question of fact. *Piaskoski & Assocs. v. Ricciardi*, 2004 WI App

152, ¶¶7-8; *Abraham v. JetSmarter Inc.*, No. 18-CV-1647, 2019 U.S. Dist. LEXIS 56420, at *9

(E.D. Wis. Apr. 2, 2019).

Moreover, under Wisconsin law, an "electronic signature" is "an electronic

sound, symbol, or process attached to or logically associated with a record and executed

or adopted by a person with the intent to sign the record." Wis. Stat. § 137.11(8). In

addition to a person's intent, the context and circumstances surrounding the execution

of an electronic signature determine its effect:

>  (1)   An electronic record or electronic signature is attributable to a
> person if the electronic record or electronic signature was created by the
> act of the person. The act of the person may be shown in any manner,
> including a showing of the efficacy of any security procedure applied to
> determine the person to which the electronic record or electronic signature
> was attributable.

>  (2)  The effect of an electronic record or electronic signature that is
> attributed to a person under sub. (1) is determined from the context and

surrounding circumstances at the time of its creation, execution, or adoption, including the parties' agreement, if any, and otherwise as provided by law.

[Wis. Stat. § 137.17]

**1.  The completion of paperwork on September 10, 2017**

In early September 2017, Malone applied for a delivery driver job with Marco's Pizza, then located at 820 8th St. S., Wisconsin Rapids, Wisconsin. (Declaration of Wayne J. Malone, Jr. ("Malone Decl.") at ¶3.) Hoogland Foods, LLC operated the business and was the employer of the employees there. (Dkt. # 8 at ¶2.) General Manager Brooke Tristan ("Tristan") interviewed Malone, and then District Manager Jackie Steele ("Steele") interviewed him. (Malone Decl. at ¶3.) Steele told him he was hired and said to come in on September 10, 2017 for his first day of work to complete paperwork and begin orientation. (*Id.*)

On September 10, 2017 Malone went to Marco's Pizza. (*Id.* at ¶4.) In order to complete the paperwork, General Manager Tristan and he stood at a computer terminal that was off to the side of the counter where customers placed orders. (*Id.*) Tristan stood directly in front of the computer screen, and Malone stood next to her left side. (*Id.*) The computer terminal that Tristan and Malone used was in a small area that also contained, among other things, a printer, racks with boxed pizzas, racks with pizza delivery bags, racks with supplies, and a cooler with sodas. (*Id.* at ¶5.)

When General Manager Tristan and Malone were doing the paperwork, it was very busy in the store, and the area they were in frequently became congested. (*Id.* at ¶6.) A couple drivers came into the area a few times, sometimes at the same time, to

4

pick up delivery tickets from the printer, pizzas, pizza bags, and sodas and bag the pizzas. (*Id.*) Malone had to move out of the way when drivers came into the area where he was standing, but Tristan would continue working on the computer. (*Id.*)

While General Manager Tristan worked on the paperwork on the computer, Malone was distracted by all the activity in the store, including the delivery drivers coming into the computer area to pick up and bag pizzas for delivery. (*Id.* at ¶7.) He looked around at his new work environment. (*Id.*) In addition to delivering pizzas, his job duties included answering phones, cashiering, taking customer orders and entering them on a computer, making and cutting pizzas, making dough, making sauce, cutting vegetables, and washing dishes. (*Id.*) He observed what the delivery drivers and other employees were doing because he wanted to learn by watching them. (*Id.*)

General Manager Tristan hurried through the paperwork. (*Id.* at ¶8.) To Malone, Tristan seemed mad about having to go through the paperwork; she told him that "Jackie" (i.e., District Manager Jackie Steele) was supposed to do it. (*Id.*) Tristan also said she wanted to get through the paperwork quickly so that Malone could get to the orientation videos. (*Id.*) He had to review the orientation videos and pass some tests before he could start working. (*Id.*) Malone felt pressure to get through the paperwork quickly, and he followed Tristan's instructions when she gave them. (*Id.*)

General Manager Tristan told Malone that a User ID and password had to be set up for him in order to get started on the paperwork. (*Id.* at ¶9.) Tristan slid the keyboard over to Malone and told him to type his email address and a password. He did not create his User ID or Employee ID Number ("EIN"). (*Id.*)

General Manager Tristan asked Malone some questions, such as how many tax deductions he was claiming and whether he had received an employee handbook. (*Id.* at ¶10.) He answered her questions, and she clicked on things or entered information into the computer. (*Id.*) Tristan quickly scrolled through a lot of reading material on the computer screen and several times clicked on things or entered information. (*Id.* at ¶11.)

Malone did not enter his User ID or EIN into the computer during the process of completing the paperwork. (*Id.* at ¶12.) However, at least one time after Malone created his password, General Manager Tristan slid the keyboard toward him and told him to type his password, which he did because he knew she was in a rush to get the paperwork done. (*Id.* at ¶13.) He did not see what was on the computer screen when he typed his password. (*Id.*) Tristan did not tell him why he had to type his password, and she did not tell him that, by entering his password, he was signing anything or agreeing to anything. (*Id.*)

Other than typing his email address and his password in the initial setup of his password and, in response to Tristan's instructions, typing his password at least one more time, Malone did not enter anything else or click on anything on the computer. (*Id.* at ¶14.)

General Manager Tristan did not tell Malone to read any of the material she scrolled through on the computer, nor did she say that he needed to or should read any of it. (*Id.* at ¶15.) Tristan did not say anything to Malone about arbitration or Hoogland's Employment Arbitration Agreement ("Arbitration Agreement") (dkt. # 8-1) or any of its terms; she did not show him the Arbitration Agreement; and she did not

give him the Arbitration Agreement in any form to read. (*Id.* at ¶16.) Neither Hoogland nor any of its employees ever said anything to Malone about arbitration or the Arbitration Agreement or any of its terms, showed him the Arbitration Agreement, or gave him the Arbitration Agreement in any form to read. (*Id.* at ¶17.)

Malone did not see or know of the existence of the Arbitration Agreement during the completion of the paperwork with General Manager Tristan. (*Id.* at ¶18.) Malone did not knowingly electronically sign the Arbitration Agreement. (*Id.* at ¶19.) He did not type his User ID ("WAYNEMALONE4788") or EIN ("266575") or name at the end of the Arbitration Agreement. (*Id.* at ¶20.)

Malone did not agree to the Arbitration Agreement. (*Id.* at ¶21.) He did not agree to the delegation of any authority to an arbitrator to decide any disputes or legal issues relating to his employment with Hoogland. (*Id.* at ¶22.) He did not agree to the delegation of any authority to an arbitrator to decide anything relating to the existence, validity, or interpretation of the Arbitration Agreement. (*Id.* at ¶23.)

Malone did not authorize anyone to, on his behalf, sign the Arbitration Agreement, agree to the Arbitration Agreement, or agree to the delegation of any authority to an arbitrator to decide any disputes or legal issues relating to his employment with Hoogland or to decide anything relating to the existence, validity, or interpretation of the Arbitration Agreement. (*Id.* at ¶24.)

Neither General Manager Tristan nor Hoogland ever gave Malone a copy of the Arbitration Agreement. (*Id.* at ¶25.) Malone did not see or know of the existence of the

Arbitration Agreement until he received a copy of it from his attorney on November 7, 2019. (*Id.* at ¶26.)

### 2. Hoogland did not make an offer of its Arbitration Agreement to Malone.

Hoogland never communicated its Arbitration Agreement to Malone. He did not see the Arbitration Agreement or know it existed until he received a copy from his attorney on November 7, 2019, the day Hoogland was served with this lawsuit. (Malone Decl. at ¶¶18, 26; dkt. # 4.)

General Manager Tristan rushed through Malone's paperwork on September 10, 2017 on a computer terminal located in a busy area of the store and never had Malone read any of the paperwork. Neither Tristan nor Hoogland nor any of its employees ever mentioned arbitration or the Arbitration Agreement or any of its terms to Malone, showed him the Arbitration Agreement, had him read it, or gave him a copy of it. (Malone Decl. at ¶¶ 8, 11, 15, 16, 17, 25.) Indeed, it was apparently Hoogland's practice not to give employees copies. In order to receive a paper copy, an employee had to email Hoogland's Human Resources Department at payroll@fvmc.com. (Dkt. # 8-1, p. 3.)[1]

### 3. Malone did not accept Hoogland's Arbitration Agreement.

Malone could not have accepted an arbitration agreement that was never communicated to him—that he never saw or heard about. He did not knowingly electronically sign the agreement. (Malone Decl. at ¶19.) He did not agree to, or

---

[1] Dkt. # 8-1 is Hoogland's Arbitration Agreement. Hoogland labeled it "Exhibit A" on a separate page, which the CM/ECF system numbered # 8-1, Page 1 of 4. The actual Arbitration Agreement has its own internal page numbers (1, 2, and 3) and CM/ECF page numbers (Page 2 of 4, Page 3 of 4, and Page 4 of 4). In this brief, Malone's references to page numbers of the Arbitration Agreement are to the CM/ECF page numbers.

authorize anyone on his behalf to agree to, the Arbitration Agreement or the delegation of any authority to an arbitrator to decide anything relating to his employment or the Arbitration Agreement. (*Id.* at ¶¶ 21, 22, 23, 24.)

While Hoogland has produced an Arbitration Agreement with Malone's User ID (i.e., "WAYNEMALONE4788") in a box labeled "Employee Electronic Signature" at the end of the agreement, that is not proof that Malone had the requisite intent to sign the document. Wis. Stat. § 137.11(8). Indeed, the context and surrounding circumstances—as referred to in Wis. Stat. § 137.17(2)—of his alleged signing of the agreement show that, if he did sign the agreement, he did it without knowing it: General Manager Tristan seemed mad about having to go through the paperwork, was in a hurry to get the paperwork done so that he could get to the orientation videos he had to watch and be tested on before he could start working, never had him read any of the paperwork, did not mention arbitration or the Arbitration Agreement, and, at least once after he initially set up his password, slid the keyboard toward him and had him type his password without telling him why or that he was signing or agreeing to anything. (Malone Decl. at ¶¶8, 11, 13, 15, 16, 25.) Malone followed Tristan's instructions without seeing what was on the computer screen when he typed his password because Tristan was in a rush. (*Id.* at ¶13.) Malone felt pressured to get through the paperwork quickly. (*Id.* at ¶8.) Moreover, there were distractions and interruptions during the paperwork process. (*Id.* at ¶¶5-7.) If Malone created an electronic signature at the end of the Arbitration Agreement, there is sufficient evidence from which a juror could reasonable conclude that he did not do it knowingly.

Furthermore, although Hoogland argues that its routine practice is to require all employees to sign an arbitration agreement and that Malone did so on September 10, 2017, this argument fails because it is based on the assertions of Shanna Hubert, Hoogland's Director of Personnel & Development, and Hubert does not have personal knowledge of what specifically transpired on September 10, 2017 when General Manager Tristan and Malone completed Malone's initial paperwork. Hubert was not present and did not witness what occurred.

Moreover, the Arbitration Agreement contradicts Hoogland's assertion that signing it was a mandatory condition of employment. "Section IV. Who Is Covered By The Arbitration Agreement?" implies that employees are not required to sign and that only those who do will be bound by it: "This Agreement covers the Company and all employees who sign the Agreement. If you decide not to enter into this Agreement, then neither you nor the Company will be bound to each other by the terms of this Agreement." (Dkt. # 8-1, p. 3.)

4. **The Employee Electronic Signature box at the end of the Arbitration Agreement appears not to contain an electronic signature.**

While Hoogland contends that Malone's electronic signature appears in the Arbitration Agreement (dkt. # 8, par. 16; dkt. #8-1, p. 3), the Arbitration Agreement itself suggests otherwise.

Below the heading "Completed Family Video New Hire Forms" and before the start of the Arbitration Agreement are listed "Employee's Identity" and "Electronic Signature" in what appears to be Arial font as follows:

| Employee's Identity | WAYNEMALONE4788 |
|---|---|
| Electronic Signature | *WAYNEMALONE4788* |

[Dkt. # 8-1, p. 2.]

The Employee's Identity appears to be in roman, i.e., a type style with upright characters, and the Electronic Signature appears to be in italics. However, the Employee Electronic Signature at the end of the Arbitration Agreement appears to be in roman (i.e., WAYNEMALONE4788) and not italics. Therefore, one could reasonably infer from the document itself that what appears in the Employee Electronic Signature box at the end of the Arbitration Agreement is <u>not</u> Malone's electronic signature but merely his User ID.

Given that Malone did not create his User ID and never entered it into the computer during the paperwork process (Malone Decl. at ¶¶9, 12), one could further reasonably infer that someone other than Malone, e.g., General Manager Tristan, entered his User ID in the Employee Electronic Signature of the Arbitration Agreement. It is reasonable to infer that Tristan created Malone's User ID and assigned him his Employee ID Number ("EIN"). (*Id.* at ¶9.) Moreover, Tristan scrolled through a lot of material on the computer and clicked on things or entered information. (*Id.* at ¶¶10, 11.)

**5.  One could reasonably infer that the Arbitration Agreement did not exist until after Malone filed the Complaint in federal court.**

Hoogland failed to produce or mention the Arbitration Agreement despite plaintiff counsel's early request for Malone's employment records and numerous statements of intent to file a complaint on behalf of Malone in federal court. The Arbitration Agreement materialized only after Malone's Complaint in this action was filed in federal court.

On June 29, 2018, months before filing a Discrimination Complaint with the Wisconsin Equal Rights Division, plaintiff counsel sent a letter to Hoogland at the Wisconsin Rapids Marco's Pizza requesting all of Malone's employment records. Included with the letter were an authorization signed by Malone and a copy of Wis. Stat. § 103.13 regarding requests for employment records. (Declaration of Amy F. Scarr ("Scarr Declaration") at ¶3, Exh. 1.)  The request was ultimately forwarded to Hoogland's corporate office. (*Id.* at ¶¶4-7.)

Hoogland faxed Malone's employment records to plaintiff counsel on July 23, 2018. The records did not include the Arbitration Agreement. (*Id.* at ¶8.)

Plaintiff counsel filed with the ERD a Discrimination Complaint on Malone's behalf against Hoogland on December 6, 2018. (*Id.* at ¶9.) During the ERD investigation, Shanna Hubert ("Hubert") represented Hoogland. She was identified as Hoogland's Director of Human Resources and Director of Personnel & Recruitment. (*Id.* at ¶10, Exhs. 2 and 3.) The ERD investigator issued a probable cause determination on

Malone's employment discrimination claims on June 10, 2019, and the case was certified for a hearing on the merits. (*Id.* at ¶11.)

Before filing the Complaint in the instant case, plaintiff counsel left multiple voicemail messages for Hubert between July 1, 2019 and July 24, 2019 stating counsel's intent to obtain a Notice of Right to Sue from the EEOC and file a complaint in federal court on behalf of Malone and asking whether Hoogland was interested in trying to settle the case before she filed. Hubert left one message for plaintiff counsel saying only that she was returning counsel's call. Plaintiff counsel left several more messages but received no further contact from Hubert or Hoogland regarding Malone's intent to file in federal court. (*Id.* at ¶12.)

On July 25, 2019 plaintiff counsel informed ERD Administrative Law Judge Selsor by email that Malone would be requesting a Notice of Right to Sue from the EEOC and filing a complaint in federal court. Hubert was copied on the email. (*Id.* at ¶13.)

Within a few days after August 15, 2019, plaintiff counsel received Malone's Notice of Right to Sue from the EEOC. Hubert was copied on the document. (*Id.* at ¶14, Exh. 4.) Plaintiff counsel filed the Complaint in this case on October 29, 2019. (*Id.* at ¶16.)  Hoogland's agent for service of process was served with a Summons and Complaint on November 7, 2019. (*Id.*)

On November 7, 2019, shortly after service was completed, Attorney Joel Griswold ("Griswold") of Baker Hostetler LLP called plaintiff counsel to say that he was representing Hoogland and that there was an arbitration agreement. Plaintiff

counsel responded that she did not know anything about an arbitration agreement, that she had requested Malone's employment records but had not received a copy of any arbitration agreement. A little later Griswold emailed plaintiff counsel Hoogland's Arbitration Agreement (dkt. # 8-1). (*Id.* at ¶17, Exh. 6.) Plaintiff counsel did not know of the existence of the Arbitration Agreement until November 7, 2019 when Attorney Griswold mentioned it and emailed it to her. (*Id.* at ¶18.)

One could reasonably infer that Hoogland did not send plaintiff counsel a copy of the Arbitration Agreement (dkt. # 8-1) before she filed Malone's Complaint in this action because it did not exist. One could also reasonably infer that Hoogland created the Arbitration Agreement after it learned of Malone's federal court Complaint. Hoogland's failure to produce the Arbitration Agreement is suspicious, especially in light of Shanna Hubert's responsibility, as Hoogland's Director of Personnel & Development, for the "administration of Hoogland's arbitration program" and her "access to . . . the electronically singed [sic] arbitration agreements for all employees of Hoogland." (Dkt. # 8 at ¶4.)

## C. Because of statute of limitations concerns, the Court should not dismiss this case.

Malone has raised a triable issue of fact regarding the formation of the Arbitration Agreement. Nonetheless, he wants to ensure that the Court does not dismiss this case because the statute of limitations has passed for filing a demand for arbitration (and for refiling this action).

The statute of limitations for filing a demand for arbitration was November 3,
2019. Attorney Griswold emailed plaintiff counsel a copy of the Arbitration Agreement
on November 7, 2019. (Scarr Decl. at ¶17, Exh. 6.) She had not known of its existence
until then. (*Id.* at ¶18.) Neither had Malone. (Malone Decl. at ¶26.)

The statute of limitations for Malone to file a demand for arbitration was the
same as the statute of limitations for filing a complaint in federal court. (Dkt. # 8-1, pp.
2-3.) The statute of limitations for filing Malone's complaint in federal court was 90 days
after Malone or his attorney received a Notice of Right to Sue ("Notice") from the
EEOC. (Scarr Decl. at ¶15, Exh. 5.) *Del Korth v. SuperValu, Inc.,* 46 F. App'x 846, 847 (7th
Cir. 2002). Malone did not receive a Notice of Right to Sue from the EEOC. (Malone
Decl. at ¶27.)

Plaintiff counsel received a Notice within a few days after August 15, 2019. (Scarr
Decl. at ¶14, Exh. 4.) The mailing date was July 31, 2019. (*Id.*) The EEOC sent the Notice
to plaintiff counsel's old address, 23 N. Pinckney St., Suite 310, Madison, WI 53703. (*Id.*
at ¶15, Exh. 5.) (The ERD's December 12, 2018 Notice of Complaint stated that Malone's
complaint had been cross-filed with the EEOC. (*Id.* at ¶9.) At that time counsel's office
was at the Pinckney St. address. (*Id.* at ¶15.))  Counsel moved to 131 W. Wilson St., Suite
900, Madison, WI 53703 in May 2019 but never notified the EEOC that she had moved
her office. (*Id.*) The Notice was forwarded to her new address, which caused a delay in
her actual receipt of the Notice. (*Id.*)

When receipt of a Notice of Right to Sue is delayed because of a failure to
provide the EEOC with a change of address, the plaintiff is deemed to have received the

Notice within five days of the mailing date. *Odeen v. Centro, Inc.*, No. 4:12-cv-04083-SLD-JEH, 2014 U.S. Dist. LEXIS 40306, at *10-11 (C.D. Ill. Mar. 26, 2014); *Reynolds v. Auto. Club of Mo.*, No. 12-cv-200-DRH-PMF, 2014 U.S. Dist. LEXIS 21560, at *9 (S.D. Ill. Feb. 19, 2014). A person cannot receive the benefit of an extended statute of limitations based on his or her own failure to provide the EEOC of a change of address. *Bobbitt v. Freeman Cos.*, 268 F.3d 535, 538 (7th Cir. 2001); *Johnson v. Spiegel, Inc.*, Case Number: 02 C 680, 2002 U.S. Dist. LEXIS 15263, at *6-8 (N.D. Ill. Aug. 15, 2002).

Therefore, plaintiff counsel is deemed to have received the Notice five days from the July 31 mailing date, <u>August 5, 2019</u>, making the 90-day deadline for filing a complaint in federal court <u>November 3, 2019</u>. Thus, the deadline for filing a demand for arbitration was also November 3, 2019. But Malone and his counsel did not become aware of the Arbitration Agreement until Hoogland disclosed it— November 7, 2019— after the statute of limitations had passed.

Given Malone's concerns regarding the statute of limitations, he requests that, if the Court must decide whether to dismiss or stay this action, the Court stay the action.

### Conclusion

Malone's evidence, including all reasonable inferences drawn therefrom in his favor, demonstrates a genuine issue of material fact regarding whether the parties contracted to arbitrate. A reasonable trier of fact could infer that Hoogland never made an offer of the Arbitration Agreement to Malone, that Malone did not electronically sign the Arbitration Agreement, or that Malone did not knowingly electronically sign the Arbitration Agreement. Therefore, the Court should deny Hoogland's motion, schedule

a trial on the matter of the formation of the Arbitration Agreement, and allow limited

discovery on this issue.

Dated this 13th day of December, 2019.

s/Amy F. Scarr
Amy F. Scarr, State Bar No. 1016179
Attorney for Plaintiff Wayne J. Malone, Jr.
Amy F. Scarr, S.C.
131 W. Wilson St., Suite 900
Madison, Wisconsin  53703
Telephone: (608) 255-6610
Fax: (608) 255-6710
Email: attorneyamyscarr@gmail.com