IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

WAYNE J. MALONE, JR.,

                Plaintiff,                          OPINION AND ORDER

v.

                                                      19-cv-891-wmc

HOOGLAND FOODS, LLC, dba
MARCO'S PIZZA,

                Defendant.

Plaintiff Wayne Malone, Jr., brought this Title VII sexual harassment and retaliation suit against his former employer, defendant Hoogland Foods, LLC ("Hoogland"). Hoogland has now moved to compel arbitration of plaintiff's claims. (Dkt. #6.) Plaintiff contests this motion, arguing that no arbitration agreement was ever offered to Malone nor accepted by him. For the reasons discussed below, the court concludes that plaintiff has established a disputed issue of material fact as to whether an arbitration agreement was formed between the parties. Accordingly, the court will deny defendant's motion to compel arbitration and schedule a trial to determine the issue of arbitrability.

BACKGROUND

Beginning in 2017, plaintiff Wayne Malone, Jr., was employed as a delivery driver at a Hoogland restaurant located in Wisconsin Rapids, Wisconsin, and doing business as "Marco's Pizza." According to defendant, Malone entered into an arbitration agreement as a condition of his employment with Hoogland. (Def.'s Br. (dkt. #7) 1.) As proof, defendant produced an affidavit from Shanna Hubert, Hoogland's Director of Personnel and Development. (*See* Hubert Decl. (dkt. #7-1).) Hubert states that an employee's

completion of "onboarding paperwork" is a mandatory condition of employment with Hoogland, and includes the execution of the arbitration agreement. (*Id.* ¶ 5.)

More specifically, Hubert explains that onboarding paperwork is completed by logging into the Hoogland intranet through the point of sale terminal located at the store. (*Id.* ¶ 6.) To access the intranet, the employee enters his or her assigned, unique User ID or Employee Identification Number ("EIN") and personal password. (*Id.*) Upon initially logging onto the intranet, the employee is presented with an arbitration agreement, which an employee may sign electronically by (1) scrolling through the agreement, (2) clicking "I Agree," and (3) entering his or her EIN and personal password. (*Id.* ¶¶ 7-8.) These actions then generate an electronic signature, which is presented in the form as the employee's User ID. (*Id.* ¶ 11.) Moreover, Hoogland keeps records of executed arbitration agreements in the course of its regularly conducted business activity. (*Id.* ¶ 12.)

Hubert further represents that on November 5, 2019, she directed a colleague to conduct a search for Malone's arbitration agreement. (*Id.* ¶ 15.) According to Hubert, that search produced a two-page arbitration agreement electronically signed by Malone and dated September 10, 2017, a "true and correct copy" of which is attached to Hubert's affidavit. (Hubert Decl. ¶ 16 & Ex. A (dkt. #7-1) ("Arbitration Agreement") 6-9.) The attached exhibit includes the following at the top of the form:

> Employee's Identity WAYNEMALONE4788 - Change Identity
> Electronic Signature WAYNEMALONE4788 - 10-SEP-17
> [Delete this Form]
>
> **Employment Arbitration Agreement**

(Arbitration Agreement at 7.) And at the bottom of the form, the exhibit displays the

following:

| | |
|---|---|
| Employee Electronic Signature WAYNEMALONE4788<br>WAYNE MALONE<br>266575 | By the Company Tim Reynolds<br>Tim Reynolds<br>VP of Legal |

(*Id.* at 9.)

In response, plaintiff produced an affidavit from Malone describing his hiring and onboarding experience. (Malone Decl. (dkt. #10).) Malone represents that he applied for a job with Marco's Pizza in early September of 2017. (*Id.* ¶ 3.) After being interviewed by General Manager Brooke Tristan and District Manager Jackie Steele, Steele told Malone that he was hired and asked him to come in on September 10, 2017, for his first day of work, during which he would be asked to complete paperwork and begin orientation. (*Id.* ¶ 3.) In accordance with these instructions, Malone arrived at Marco's Pizza on September 10, 2017, and Tristan directed him to a computer terminal to complete the paperwork. (*Id.* ¶ 4.)

According to Malone, *Tristan* then stood in front of the computer screen, while Malone stood next to her. (*Id.*) At the time, the store was busy, with delivery drivers coming into the area by the computer terminal to pick up and bag pizzas for delivery. (*Id.* ¶ 7.) While Tristan worked on the paperwork at the computer, Malone reports being distracted by all the activity in the store and observing what the other employees were doing. (*Id.*) Malone also recalled that: (1) Tristan seemed mad about having do go through the paperwork; (2) she told Malone that District Manager Steele was supposed to do it; and (3) he felt pressure to get through the paperwork quickly. (*Id.* ¶ 8.) Malone says

3

that he also had to review the orientation videos and pass some tests before he could start working. (*Id.*)

During this process, Malone acknowledges Tristan explained that a User ID and password had to be set up for him to get started on the paperwork, and she then slid the keyboard to Malone and told him to enter his email address and a password. (*Id.* ¶ 9.) Tristan also asked Malone some questions, such as how many tax deductions he was claiming and whether he had received an employee handbook, and he answered them. (*Id.* ¶ 10.) After answering her questions, Malone avers that Tristan quickly scrolled through a lot of reading material on the computer screen, clicked on several items, and entered information. (*Id.* ¶ 11.)

At least once after Malone created his password, he also acknowledges that Tristan slid the keyboard toward him and told him to type in his password, which he did. (*Id.* ¶ 13.) However, Malone maintains that: (1) he did not see what was on the computer screen in doing so; (2) Tristan did not tell him why he had to type in his password; and (3) she did not tell him that he was signing electronically or agreeing to anything. (*Id.*) In particular, Malone avers that he *never* entered his User ID or EIN into the computer; and other than initially entering his email and password, and again entering his password when prompted by Tristan, he did not personally enter anything into the computer nor did he click on anything. (*Id.* ¶¶ 12, 14.) Malone further avers that neither Tristan nor any other Hoogland employee ever told him to read any of the material Tristan scrolled through on the computer, said anything to him about arbitration or the arbitration agreement, or showed him the arbitration agreement. (*Id.* ¶¶ 16, 17.)

4

Finally, plaintiff produced an affidavit from Malone's attorney, Amy Scarr, representing that at various points beginning in June of 2018, she requested Malone's employment records from Hoogland pursuant to Wis. Stat. § 103.13. (Scarr Decl. (dkt. #11) ¶¶ 1-12.) Attorney Scarr explains that Hoogland did not produce the arbitration agreement until after this lawsuit was filed in federal court in November of 2019. (*Id.* ¶ 18.)

OPINION

The Federal Arbitration Act ("FAA"), 9 U.S.C. § 1, *et seq.*, "requires judicial enforcement of a wide range of written arbitration agreements." *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 111 (2001). Specifically, "[e]mployment contracts, except for those covering workers engaged in transportation, are covered by the FAA," *EEOC v. Waffle House, Inc.*, 534 U.S. 279, 289 (2002), and Title VII claims are subject to pre-dispute arbitration agreements. *Koveleskie v. SBC Capital Markets, Inc.*, 167 F.3d 361, 365 (7th Cir. 1999). Moreover, once a district court is satisfied that the parties agreed to arbitrate, it must promptly compel arbitration. *Tinder v. Pinkerton Sec.*, 305 F.3d 728, 735 (7th Cir. 2002) (citing 9 U.S.C. § 4).

Still, "before referring a dispute to an arbitrator, the court determines whether a valid arbitration agreement exists." *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 530 (2019) (citing 9 U.S.C. § 2). Further, if the court finds that there is a factual dispute as to whether an agreement for arbitration exists, the FAA provides "shall proceed to trial" of that question. 9 U.S.C. § 4; *Scheurer v. Fromm Family Foods LLC*, 863 F.3d 748, 751 (7th Cir. 2017).

5

In reviewing a motion to compel arbitration, courts apply a standard similar to that used at summary judgment: all evidence and inferences are to be viewed in a light most favorable to the non-movant. *See id.*; *Moorman v. Charter Commc'ns, Inc.*, No. 18-CV-820-WMC, 2019 WL 1930116, at *1 (W.D. Wis. May 1, 2019). Moreover, "[t]he party opposing arbitration must identify a triable issue of fact concerning the existence of the agreement in order to obtain a trial on the merits of the contract." *Tinder*, 305 F.3d at 735 (citing *Saturday Evening Post Co. v. Rumbleseat Press, Inc.*, 816 F.2d 1191, 1196 (7th Cir. 1987)).

In its motion to compel arbitration of plaintiff's Title VII claims, defendant contends that the parties entered into a binding agreement that plaintiff's claims be submitted to arbitration. (Def.'s Br. (dkt. #7) 1.) Plaintiff opposes this motion, arguing that no arbitration agreement was formed because there was no offer or acceptance of the agreement. (Pl.'s Opp'n (dkt. #9) 1.)[1] In reply, defendant maintains that plaintiff's proffered evidence and argument does not create a dispute of material fact as to the existence of the arbitration agreement, meaning that arbitration on the parties' underlying dispute is legally required. (Def.'s Reply (dkt. #12) 1-2.)

"Whether a binding arbitration agreement exists is determined under principles of state contract law." *Tinder*, 305 F.3d at 733 (citing 9 U.S.C. § 2; *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995)). Here, all relevant events occurred in Wisconsin,

---

[1] In the alternative, plaintiff requests that the court stay rather than dismiss the case pending arbitration. (*Id.* 14-16.)

and Wisconsin contract law controls. *Id.* (citing *Michalski v. Circuit City Stores, Inc.*, 177 F.3d 634, 636 (7th Cir. 1999)).

Under Wisconsin law, a valid contract must be supported by an offer, acceptance, and consideration. *Runzheimer Int'l, Ltd. v. Friedlen*, 2015 WI 45, ¶ 20, 362 Wis. 2d 100, 862 N.W.2d 879. "An offer is the manifestation of [a] willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it." *Vill. of McFarland v. Town of Dunn*, 82 Wis. 2d 469, 474, 263 N.W.2d 167 (1978) (quoting Restatement 2d of Contracts § 24 (1973)). Acceptance is the manifestation of assent to the offer. *Hoffman v. Ralston Purina Co.*, 86 Wis. 2d 445, 454, 273 N.W.2d 214 (1979). Finally, consideration is "a detriment incurred by the promisee or a benefit received by the promisor at the request of the promisor." *First Wisconsin Nat. Bank of Milwaukee v. Oby*, 52 Wis. 2d 1, 5, 188 N.W.2d 454 (1971).

"The existence of an offer and acceptance are mutual expressions of assent." *McLellan v. Charly*, 2008 WI App 126, ¶ 37, 313 Wis. 2d 623, 758 N.W.2d 94 (quoting *Gustafson v. Physicians Insurance Co.*, 223 Wis. 2d 164, 173, 588 N.W.2d 363 (Ct. App. 1998)). However, mutual assent "does not mean that parties must subjectively agree to the same interpretation at the time of contracting." *Management Computer Serv., Inc. v. Hawkins, Ash, Baptie & Co.*, 206 Wis.2d 158, 178, 557 N.W.2d 67 (1996). Thus, in construing a contract, the court's role is to determine "not necessarily what [the parties] intended to agree to, but what, in a legal sense, they did agree to, as evidenced by the language they saw fit to use." *Marion v. Orson's Camera Centers, Inc.*, 29 Wis. 2d 339, 345, 138 N.W.2d 733 (1966).

I.  **Offer**

Plaintiff first argues that no arbitration agreement exists because Hoogland did not offer an arbitration agreement to Malone. (Pl.'s Opp'n (dkt. #9) 8.) Indeed, Malone avers that no Hoogland employee ever mentioned arbitration, the arbitration agreement, the terms of that agreement; nor did anyone at Hoogland ever show him the agreement, have him read it, or give him a copy of the agreement. (*Id.*) Defendant counters that Hoogland offers the terms of the arbitration agreement as a matter of course during any employee onboarding process, and Malone's claimed failure to read the terms of the agreement does not mean that an offer was not communicated. (Def.'s Reply (dkt. #12) 2-3.)

As a general matter, Malone need not have been specifically aware of the arbitration agreement or its terms in order for a valid offer to have been made by Hoogland. As discussed above, mutual assent does not require that the parties subjectively intended to agree to the same thing. *Management Computer Serv., Inc.*, 206 Wis. 2d at 178. A corollary of this principle is that: "An offeree, knowing that an offer has been made to him, need not know all its terms. Knowing that an offer has been made, he can accept without investigation of the exact terms, either intentionally or by words or conduct creating an unintended appearance of intention to accept." Restatement 2d, § 23 cmt. e. Relatedly, defendant is also correct that a party's "[f]ailure to read a contract before signing it will generally not affect its validity." *State Farm Fire & Cas. Co. v. Home Ins. Co.*, 88 Wis. 2d 124, 129, 276 N.W.2d 349 (Ct. App. 1979) (citing *Standard Mfg. Co. v. Slot*, 121 Wis. 14, 24, 98 N.W. 923 (1904); 17 Am. Jur. 2d Contracts § 149 (1964)).

Nevertheless, plaintiff has demonstrated that a genuine dispute of material fact as to whether Hoogland actually communicated an offer during *Malone's* onboarding process. To be sure, there can be no reasonable dispute that at some point Hoogland made a general offer of employment to Malone. On the facts presented, however, Hoogland arguably failed to communicate to Malone that the onboarding paperwork contained terms modifying its general employment offer, much less specifically contained an agreement to arbitrate any employment dispute.

On the contrary, if Malone is believed, in her haste, Tristan did not follow the formal onboarding process by failing to place the computer screen in front of Malone, giving him a meaningful opportunity to consider the written terms of his agreement, including it being conditioned an entering into an arbitration agreement. *See Vill. Of McFarland*, 82 Wis. 2d at 474 ("An offer is the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it."); 1 Williston on Contracts § 4:16 (4th ed.) ("As a general principle, an offeree cannot actually assent to an offer unless the offeree knows of its existence."). *See also Williams v. Gen. Elec.*, 13 F. Supp. 3d 1176, 1184 (N.D. Ala. 2014) (finding that no arbitration agreement existed because employer did not communicate offer of arbitration provision to employee); *Owen v. MBPXL Corp.*, 173 F. Supp. 2d 905, 923 (N.D. Iowa 2001) (same); *Stepp v. NCR Corp.*, 494 F.Supp.2d 826 (S.D. Ohio 2007) (genuine issue of fact existed regarding whether offer of arbitration agreement was communicated to plaintiff).

Defendant counters that: Malone admits to knowing that there was "a lot of reading material on the computer screen"; and Malone does not claim that he was *prevented* from asking questions about the material. (Def.'s Reply (dkt. #12) 2 (quoting Malone Dec. (dkt. #10) ¶ 11).) This evidence does arguably support defendant's position that an offer of the arbitration agreement was made and Malone simply chose not to read its terms. However, that Malone saw reading material on a screen does not conclusively demonstrate that Hoogland manifested a willingness to enter into a bargain. Because plaintiff has demonstrated that a factual dispute exists regarding the existence of an offer, this question must be resolved by a trial.

## II. Acceptance

Plaintiff also argues that even if meaningfully offered, Malone did not manifest acceptance of the arbitration agreement. Certainly, defendant has produced a document that at least facially appears to be an Arbitration Agreement electronically signed by Malone, which is strong evidence in its favor: "the fact that a party has signed a contract creates a strong presumption that the party has assented to the terms of the agreement." 17A Am. Jur. 2d Contracts § 172. As noted above, even if a party fails to read a contract before signing it, that generally does not affect its validity. *See State Farm Fire & Cas. Co.*, 88 Wis. 2d at 129. Indeed, the Wisconsin Supreme Court has said that "[a] person signing a document has a *duty* to read it and know the contents of the writing." *Richards v. Richards*, 181 Wis. 2d 1007, 1017, 513 N.W.2d 118 (1994) (emphasis added).

These same rules apply to electronic signatures under Wis. Stat. § 137.15(1), which provides that a signature may not be denied legal effect just because it is in electronic form.

An electronic signature "is attributable to a person if the . . . electronic signature was created by the act of the person." Wis. Stat. § 137.17(1). This still leaves the question as to whether the electronic signature on the Arbitration Agreement was created by *Malone*, and the answer to that question "may be shown in any manner, including the efficacy of any security procedure applied to determine the person to which the electronic record or electronic signature was attributable." *Id*. Moreover, the effect of an electronic signature "is determined from the context and surrounding circumstances at the time of its creation, execution, or adoption, including the parties' agreement, if any, and otherwise as provided by law." Wis. Stat. § 137.17(2).

      Plaintiff has produced evidence that creates a reasonable doubt as to whether Malone did in fact sign the agreement proffered by defendant. On the arbitration form, the following appears in the field for electronic signature at the start of the document: "*WAYNEMALONE4788*." (Hubert Decl., Ex. A (dkt. #7-1) 7.) Similarly, at the end of the document "WAYNEMALONE4788" appears in the field for "Employee Electronic Signature." (*Id.* at 9.)[2] The parties agree that "WAYNEMALONE4788" is Malone's User ID, yet Malone specifically testified in his affidavit that he never entered his User ID into the computer during the paperwork process, much less authorized Tristan to do so on his behalf. (Malone Decl. (dkt. #10) ¶¶ 9, 12.)

---

[2] Plaintiff also argues that because the "signature" at the top of the document is in italics, while the "signature" at the bottom is not, this creates a reasonable inference that the non-italicized one is not actually a signature but rather just his User ID. But the court is not persuaded that any reasonable inference can be drawn from the difference in fonts.

Defendant responds merely by pointing to Hubert's declaration, which represents that as a matter of ordinary practice, to sign the arbitration agreement electronically, an employee would have to scroll through the agreement, click "I agree," and enter his EIN and personal password. (Hubert Decl. (dkt. #7-1) ¶ 8.) According to defendant, the electronic signature then *presents* as the employee's User ID, even if the employee never specifically typed it. (*Id.* ¶ 11.) Accordingly, defendant suggests that Malone's representation that he only typed in his password is consistent with its argument that the electronic signature was "created by the act" of Malone and attributable to him. *See* Wis. Stat. § 137.17(1).

However, as discussed, the question as to whether Malone created that signature is open to dispute, particularly since he claims Tristan departed from Hoogland's own "security procedure" under Wis. Stat. § 137.17(1) by entering it herself, as does the question of the effect of the electronic signature, which must be "determined from the context and surrounding circumstances at the time of its creation." Wis. Stat. § 137.17(2). Moreover, the comments to the Uniform Electronic Transactions Act, on which Wis. Stat. § 137.17 is based, provide that, at least in a click-through transaction, an "intent to 'sign'" is relevant to determining the existence of an electronic signature. *See* Unif. Electronic Transactions Act § 9, cmt. 5. Here, Malone states that he only typed in his password as Tristan directed without ever being shown or seeing what was on the screen. Even if that act did result in the generation of his username in the "electronic signature field," given the hurried manner of its presentment and the context of his act, Malone's actual "intent to sign" is open to reasonable dispute.

Finally, even if Malone's act of typing his password did create a signature, that alone is not enough to establish acceptance of a contract. Although a party who signs a contract creates a presumption of acceptance even if he has failed to read the contract, 17A Am. Jur. 2d Contracts § 172, this proposition "is qualified by the principle that he who signs a document reasonably believing it is something quite different than it is cannot be bound to the terms of the document." *Operating Engineers Pension Tr. v. Gilliam*, 737 F.2d 1501, 1504 (9th Cir. 1984) (citing *Chandler v. Aero Mayflower Transit Co.*, 374 F.2d 129, 136 (4th Cir. 1967); *Reid v. Landon*, 166 Cal.App.2d 476, 333 P.2d 432 (1958); J. Calamari & J. Perillo, Contracts 332 (2d ed. 1977); 1 Williston on Contracts § 95A (3d ed. 1957)). Here, plaintiff argues that Malone did not know that he was signing an arbitration agreement when he entered in his password because Tristan never explained it to him nor gave him a meaningful opportunity to not read the document. At this stage the court must consider the evidence in the light most favorable to Malone, and so viewed, he has at least created an issue of fact as to whether he signed the arbitration agreement under a reasonable misapprehension of the nature of the document.

### III.   Consideration

Plaintiff argues separately that the document being offered as the Arbitration Agreement does not reflect Malone's signature or assent based on speculation that the document was not created until long after his employment began and, indeed, after plaintiff filed suit in federal court. (Pl.'s Opp'n (dkt. #9) 12.) Specifically, plaintiff claims that Hoogland did not produce that document until November of 2019, despite numerous earlier requests to produce all of Malone's employment records. Thus, plaintiff argues that:

"One could reasonably infer that Hoogland did not send plaintiff counsel a copy of the Arbitration Agreement (dkt. # 8-1) before she filed Malone's Complaint in this action because it did not exist.  One could also reasonably infer that Hoogland created the Arbitration Agreement after it learned of Malone's federal court Complaint." (*Id.* at 14.) Defendant counters that Malone never actually requested a copy of the arbitration agreement, pointing out that his attorney asked for documents under Wis. Stat. § 103.13, which merely requires an employer to permit an employee to inspect certain personnel documents. (Def.'s Reply (dkt. #12) 4.)  In particular, defendant argues that statute does *not* include agreements between an employer and employee such as an arbitration agreement. (*Id.*)

Even considering this evidence in the light most favorable to plaintiff, the court is not persuaded that Hoogland's late production of the arbitration agreement raises a reasonable inference that it was manufactured after plaintiff's federal lawsuit, at least absent more.  Because plaintiff has demonstrated that other, triable disputes exist, however, the court will not at this point preclude plaintiff from pursuing this theory.[3]

---

[3] Other than the proffered document which defendant contends is the signed Arbitration Agreement, and its general business practices, defendant has produced no other evidence indicating that Malone assented to arbitration.  If the terms had provided that Malone, by working at Hoogland, assented to be bound by the arbitration agreement then his conduct in continuing to work at Hoogland may well have evinced acceptance and consideration.  *See Tinder*, 305 F.3d at 734 (applying Wisconsin law to conclude that a binding contract was created when an employee remained on the job after her employer communicated an arbitration agreement that provided expressly that employees who remained employed agreed to submit their claims to arbitration).  However, the contract contains no such terms.  Instead, it provides that the agreement "covers the Company and all employees who sign the Agreement.  If you decide not to enter into this Agreement, then neither you nor the Company will be bound to each other by the terms of this Agreement." (Hubert Decl., Ex. A (dkt. #7-1) 2.)  Thus, at least by the terms of the agreement, Malone's continued employment at Hoogland would not appear to represent consideration for the

In sum, because plaintiff has demonstrated that there is a genuine dispute of fact regarding whether an arbitration agreement exists between the parties, the court will deny defendant's motion to compel arbitration. Pursuant to Section 4 of the FAA, the court will refer to trial questions as to whether the arbitration agreement was offered by Hoogland and whether Malone accepted this offer. Further, as requested by plaintiff, the court will permit limited discovery regarding only the issue of the formation of the arbitration agreement. *See Deputy v. Lehman Bros.*, 345 F.3d 494, 511 (7th Cir. 2003) (where issue of existence of arbitration agreement is referred to trial under section 4 of the FAA, parties are permitted limited discovery).

ORDER

IT IS ORDERED that:

1) Defendant's motion to compel arbitration (dkt. #6) is DENIED.

2) On October 30, 2020, at 2:00 p.m., the court will hold a zoom conference with the parties' counsel to discuss the scheduling and procedures for an expedited trial on the existence of the Arbitration Agreement.

3) On or before October 28, 2020, the parties are to meet and confer and file a joint pretrial conference report or, if unable to agree, separate reports consistent with local procedures.

Entered this 21st day of October, 2020.

BY THE COURT:
/s/

_____

WILLIAM M. CONLEY
District Judge

---

contract. And, unlike in *Tinder*, there is a factual dispute here over whether the terms were actually communicated.